IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Brandy T.,[1] | ) | C/A No.: 1:20-cv-2994-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable David C. Norton, United States District Judge, dated September 11, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On April 23, 2018, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on June 30, 2017. Tr. at 85, 86, 181–82, 183–92. Her applications were denied initially and upon reconsideration. Tr. at 112–15, 122–27. On December 2, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") James M. Martin. Tr. at 30–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 17, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 19, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 40 years old at the time of the hearing. Tr. at 37. She completed the eleventh grade. Tr. at 40. Her past relevant work ("PRW") was as an assistant manager in a retail store. Tr. at 41. She alleges she has been unable to work since June 30, 2017. Tr. at 181.

2.    Medical History[2]

Plaintiff presented to the emergency room ("ER") at Union Medical Center on October 20, 2015, with complaints of lower extremity pain and swelling. Tr. at 412. The attending physician noted bilateral lower extremity edema and discoloration. *Id.* He encouraged Plaintiff to accept a transfer to another facility to consult with a vascular specialist, but Plaintiff indicated she needed to return home to care for her children. Tr. at 413. The physician assessed acute arterial insufficiency and discharged Plaintiff against medical advice. *Id.*

Plaintiff followed up with her primary care physician ("PCP") W. Lance Miller, M.D. ("Dr. Miller"), on October 29, 2015. Tr. at 436. She complained of worsening swelling, pain, tingling, and burning in her bilateral legs over the prior couple of weeks. *Id.* She also endorsed cramping in her calves and

---

[2] The record contains evidence from the period prior to Plaintiff's alleged onset date, with some treatment notes going back to 2006. The undersigned declines to summarize most records for the period more than 12 months prior to Plaintiff's alleged onset date.

thighs. *Id.* She denied relief, despite taking Lasix and potassium chloride. *Id.* Dr. Miller noted gait within normal limits, moderate edema and erythema of the bilateral legs, 2+ pulses, and severe varicose veins. *Id.* He assessed cellulitis of the lower limb, edema of the lower leg, varicose veins, and venous insufficiency of the leg. Tr. at 436–37. He prescribed Triamcinolone 0.1% topical cream, Spironolactone 50 mg, potassium chloride 20 mEq, Lasix 40 mg, and Keflex 500 mg. Tr. at 437. He instructed Plaintiff to keep her legs elevated, to use ankle pumps, and to remain out of work until November 4. *Id.* He referred Plaintiff to a vascular specialist and ordered thigh-high compression stockings. *Id.*

On November 6, 2015, Plaintiff reported new onset of warmth in her bilateral legs upon standing. Tr. at 435. She also endorsed cramps in her thighs and swelling and pain in both legs, but noted tingling and burning were improving. *Id.* Dr. Miller observed normal gait, moderate edema of the bilateral legs, severe varicose veins in the bilateral lower legs, and 2+ pulses. Tr. at 436. He assessed edema of the lower leg, varicose veins, venous insufficiency of the leg, and lower limb cramp. *Id.* He discontinued Keflex 500 mg, increased potassium chloride to twice a day, and authorized Plaintiff to remain out of work until after she followed up with the vascular surgeon. *Id.*

Plaintiff presented to vascular surgeon Scott Hovis, M.D. ("Dr. Hovis"), for suspected venous insufficiency and cellulitis on December 10, 2015. Tr. at

272. Her legs were swollen, and she reported wearing compression stockings and elevating her legs often. *Id.* She indicated that her job in a store required she stand and aggravated her symptoms. *Id.* She stated swelling in her ankles had improved with use of Lasix and compression stockings, but endorsed continued pain in her thighs. *Id.* She was 64" tall and weighed 203 pounds. *Id.* Dr. Hovis noted edema on lower extremity exam and ecchymosis on skin exam. Tr. at 274. He observed bilateral lower extremity edema with lipodermatosclerosis and very mild inflammatory cellulitis that did not appear to be infectious. *Id.* He recorded normal findings on vascular exam and indicated mild venous stasis dermatitis with no varicosities. *Id.* He reviewed a duplex study and stated it showed no deep venous thrombosis, superficial venous thrombosis, or reflux, but elevated central venous pressure ("CVP"). *Id.* Dr. Hovis diagnosed non-vascular edema, likely secondary to obesity and counseled Plaintiff on weight loss, regular walking, compression, and elevation. *Id.* He also diagnosed inflammatory cellulitis, secondary to chronic edema. *Id.* He indicated Plaintiff might benefit from a referral to the lymphedema clinic and should follow up with her PCP for a referral. *Id.*

Plaintiff returned to Dr. Miller on December 15, 2015. Tr. at 434. Dr. Miller noted the vascular surgeon had released Plaintiff, noting good flow to the arteries and veins. *Id.* Plaintiff indicated her swelling and tingling were the same and stated she continued to use compression stockings and Lasix to

address swelling. *Id.* Dr Miller observed gait within normal limits, moderate edema to the bilateral legs, severe varicose veins in the bilateral lower legs, and 2+ pulses. Tr. at 435. He assessed lower leg edema, varicose veins, venous insufficiency of leg, and cramp in lower limb. *Id.* He instructed Plaintiff to elevate her bilateral lower extremities, wear well-fitting support shoes and stockings, and continue her medications. *Id.* He stated Plaintiff could return to work at full duty. *Id.*

Plaintiff complained of worsening bilateral knee pain and right ankle pain on January 21, 2016. Tr. at 433. She reported increased pain with prolonged standing, but indicated the edema in her legs had improved. *Id.* Dr. Miller noted normal findings on physical exam. Tr. at 434. He assessed knee pain, ankle pain, arthralgia, and edema of the lower leg and prescribed Nabumetone 750 mg twice a day and Tramadol 50 mg every six hours. *Id.* He ordered antinuclear antibody ("ANA"), rheumatoid arthritis ("RA") factor, and erythrocyte sedimentation rate ("ESR") panels. *Id.* A follow up note indicates all three panels were negative. Tr. at 445.

On February 12, 2016, Plaintiff complained of bilateral knee pain with popping and grinding, muscle pain, and neuropathic pain in her legs and feet, but indicated her leg swelling was somewhat improved. Tr. at 432. Dr. Miller noted normal gait, moderate edema of the bilateral legs, 2+ pulses, and severe varicose veins in the bilateral lower legs. Tr. at 433. He discontinued

Nabumetone 750 mg and prescribed ibuprofen 800 mg three times a day and Clotrimazole-Betamethasone 1%–0.05% topical lotion twice a day. *Id.* He ordered nerve conduction studies ("NCS") of the bilateral legs. *Id.*

Plaintiff complained of edema and tingling in her finger and toes on February 17, 2016. Tr. at 431. Dr. Miller noted neurovascular/autonomic nervous system ("ANS") testing showed mild endothelial dysfunction, borderline cardiometabolic risk, borderline homeostasis, and otherwise normal findings. Tr. at 432. He assessed peripheral neuropathy, lower leg edema, and lower limb cramp. *Id.*

Plaintiff did not return to Dr. Miller until June 1, 2017, when she presented with edema and neuropathic pain in her bilateral legs. Tr. at 429. She was 65" tall and weighed 194 pounds. Tr. at 430. Dr. Miller noted normal gait, 2+ pulses, moderate edema, and severe varicose veins in the bilateral legs. Tr. at 430. He assessed bilateral leg pain, peripheral neuropathy, lower leg edema, fatigue, and anemia. *Id.* He ordered NCS of the bilateral lower extremities and placed Plaintiff on medical leave from June 1 through June 30. *Id.*

Plaintiff presented to neurosurgeon Timothy Monroe, M.D. ("Dr. Monroe"), for evaluation of low back pain with radiation into her bilateral lower extremities on December 6, 2017. Tr. at 479. Dr. Monroe noted antalgic gait, tenderness to palpation of the lumbosacral spine, radicular symptoms

with movement of the lumbar spine, positive bilateral straight-leg raising ("SLR") test, and otherwise normal findings. Tr. at 481. Dr. Monroe stated x-rays of Plaintiff's lumbar spine revealed no acute pathology. *Id.* He ordered magnetic resonance imaging ("MRI") of the lumbar spine and referred Plaintiff to physical therapy. *Id.*

Plaintiff presented for an initial physical therapy assessment on December 19, 2017. Tr. at 484. She complained of low back pain exacerbated by standing and prolonged sitting that radiated to her bilateral lower extremities. *Id.* She estimated she could sit or stand for 30 minutes at a time. *Id.* She endorsed weakness in her lower extremities, noting her legs would "giv[e] out" on occasion. *Id.* Physical therapist Constance Giles ("PT Giles"), observed Plaintiff to demonstrate 5/5 strength with abduction and adduction, lumbar flexion to 45 degrees, lumbar extension to 25 degrees, 5/5 bilateral lower extremity strength, tenderness to palpation along the paraspinals, mild restriction of lumbar joint mobility, normal sensation, antalgic gait with decreased step length, right hamstring flexibility to 45 degrees, and left hamstring flexibility to 50 degrees.  Tr. at 484–85. She noted Plaintiff had limited rotation and side bending for functional mobility and transfers. Tr. at 484. She indicated Plaintiff's signs and symptoms were consistent with lumbar degenerative disc disease ("DDD") and that she would benefit from skilled physical therapy twice a week for six weeks. Tr. at 485, 486. Plaintiff

followed up for physical therapy sessions on December 21 and 29. Tr. at 488–91.

On March 2, 2018, Plaintiff underwent an MRI of her lumbar spine that showed minor multilevel disc bulges without apparent spinal cord or nerve root compromise. Tr. at 474.

On March 8, 2018, Dr. Monroe indicated on a patient disability statement that Plaintiff was "[t]otal[ly] [d]isabled" through March 29, 2018. Tr. at 493.

Plaintiff followed up with nurse practitioner Michael S. McGuinn ("NP McGuinn") in Dr. Monroe's office on March 28, 2018. Tr. at 494. She reported considerable improvement in her symptoms following three physical therapy sessions. *Id.* NP McGuinn noted the MRI showed no significant pathology in the lumbar spine consistent with Plaintiff's complaints. *Id.* He observed normal gait, normal bilateral upper and lower extremity strength, positive lower back pain, no radicular symptoms in the lumbar spine, negative SLR, and no swelling, edema, or erythema in the lumbar spinal tissue. Tr. at 496. He ordered additional physical therapy and encouraged Plaintiff to attend more than three visits. *Id.* He prescribed Mobic and instructed Plaintiff to follow up as needed. *Id.*

On August 3, 2018, Plaintiff presented to Edvin Byrd, III, M.D. ("Dr. Byrd"), for a consultative exam. Tr. at 500. She complained of low back pain,

lumbar radiculopathy, neuropathy, and sciatica. *Id.* She reported using a cane, being unsteady on her feet, and losing her balance, as her right leg would give way. *Id.* She endorsed weight loss, irregular periods, heavy menstrual cycles, muscle weakness, joint pain, muscle pain, cramping, loss of balance, pain upon walking, and swelling in her hands, feet, and ankles. Tr. at 500–01. Plaintiff was 65.25" tall, weighed 197 pounds, and had a body mass index ("BMI") of 30.88. Tr. at 501. Dr. Byrd stated Plaintiff had no atrophy, but endorsed extreme tenderness to her low back. Tr. at 502. He noted Plaintiff was unable to sit for long periods of time and "actually needed to lay out straight with sort of her trunk elevated and [illegible] hanging down it caused some significant discomfort." *Id.* He indicated Plaintiff used a cane in her right hand, had difficulty ambulating, "walk[ed] kind of hunched over, and sort of shuffle[d] down the hallway." *Id.* He recorded normal findings on neurological exam. *Id.* He noted Plaintiff had "a lot of blotchiness" to the skin of her right lower leg. *Id.* He recorded normal findings on psychiatric exam, except that he indicated Plaintiff seemed very uncomfortable. *Id.* He observed normal range of motion ("ROM") of Plaintiff's cervical spine, shoulders, elbows, wrists, and ankles. *Id.* He noted lumbar flexion to 25 to 30 degrees with significant pain and inability to extend or laterally flex the lumbar spine without significant pain. *Id.* He indicated Plaintiff had normal ability to flex and extend her knees and could abduct,

adduct, flex, and internally rotate her hips, except that the movements caused significant pain in her lower back. *Id.* He recorded positive SLR test to 30 degrees in the sitting and supine positions. *Id.* He stated Plaintiff had 4/5 grip strength and no swelling, deformity, tenderness, or loss of ROM in her hands. *Id.* He indicated Plaintiff had normal pincer grasp and normal grip on fine and gross manipulation. *Id.* Dr. Byrd noted Plaintiff was unable to squat, tandem walk, heel walk, or toe walk. *Id.* He recorded 3/5 strength in Plaintiff's proximal upper extremities and 4/5 strength in her distal extremities and bilateral upper arms. *Id.* He observed 3/5 strength in Plaintiff's lower extremities. *Id.* He indicated 0–1 reflexes in Plaintiff's upper and lower extremities and 2+ and equal pulses in the bilateral upper and lower extremities. *Id.* Dr. Byrd admitted that he had not reviewed results of the MRI of Plaintiff's lumbar spine. Tr. at 503. He wrote: "I have no idea what the results are, but just looking at her physical exam, I would assume that she had some lumbar radiculopathy or some kind of significant pathology in her lower spine that causes significant amount of pain." *Id.* He stated Plaintiff was "in severe discomfort and pain from her lower back problems." *Id.* He wrote: "She would be unable to get a job for 8 hours a day 40 hours a week in her current condition." *Id.*

On September 21, 2018, state agency medical consultant Kimberley Patton, M.D. ("Dr. Patton"), reviewed the record and assessed Plaintiff's

11

physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours; sit for a total of about six hours in an eight-hour workday; occasionally push/pull with the bilateral feet; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently handle with the bilateral upper extremities; and avoid even moderate exposure to hazards. Tr. at 67–70, 78–81.

On November 10, 2018, a second state agency medical consultant, Sannagai Brown, M.D. ("Dr. Brown"), reviewed the record and provided the same physical RFC as Dr. Patton. *Compare* Tr. at 67–70 *and* 78–81, *with* Tr. at 94–96 *and* 105–07.

Plaintiff presented to Spartanburg MEDcare on March 4, 2019, for leg pain related to neuropathy. Tr. at 535. She denied taking medication. *Id.* She weighed 190 pounds and had a BMI of 30.66. Tr. at 536. William Miller, M.D. ("Dr. Miller"), observed mild edema of Plaintiff's bilateral lower legs, normal posture, hyperpigmented skin changes to the bilateral lower legs, hyperesthesia of the bilateral lower legs, and normal mood, judgment, and affect. *Id.* He assessed unspecified mononeuropathy of the bilateral lower limbs, prescribed Gabapentin 600 mg twice a day, and instructed Plaintiff to follow up with her PCP as soon as possible. *Id.*

On April 4, 2019, Plaintiff presented to Charles Bounds, M.D. ("Dr. Bounds"), to establish primary care. Tr. at 504. She endorsed symptoms consistent with mild depression. *Id.* She reported a pins-and-needles sensation in her legs and feet and pain radiating from her back to her lower legs, but denied similar sensations in her hands. *Id.* Dr. Bounds noted full ROM of Plaintiff's cervical spine; no cyanosis, clubbing, or edema in her extremities; 2+ peripheral pulses; 2+ and symmetrical deep tendon reflexes, and intact sensory exam. Tr. at 505. He assessed essential hypertension and hereditary and idiopathic neuropathy. *Id.* He referred Plaintiff for lab studies that confirmed anemia. Tr. at 507.

Plaintiff presented for a mental health center initial clinical assessment on October 9, 2019. Tr. at 527. She complained of feeling anxious, stressed, and overwhelmed due to financial problems and endorsed tearfulness, lack of sleep, and weight loss. *Id.* She indicated she was unable to work due to neuropathy in her legs, stayed to herself, and cried a lot. *Id.* She noted she addressed her problems through prayer and going to church. *Id.* Counselor Kanisha Alleyne ("Counselor Alleyne"), observed Plaintiff to appear disheveled, but to have normal motor activity, cooperative attitude, calm behavior, normal eye contact, appropriate affect, euthymic mood, normal rate and tone of speech, and logical/goal directed thought process. Tr. at 531–32. Plaintiff denied obsessions, delusions, hallucinations, and

homicidal and suicidal ideation. Tr. at 532. She endorsed early awakening, sleep at short intervals, nightmares, waking up pacing, decreased appetite with weight change, decreased energy, and fatigue. *Id.* Counselor Alleyne noted Plaintiff was alert and oriented to time, place, and person; had intact recent and remote memory, attention, and immediate recall; had fair-to-good judgment; had limited insight; was easily distracted; and had a below average fund of knowledge. *Id.* She assessed adjustment disorder with depressed mood and unspecified anxiety disorder. Tr. at 533. She recommended cognitive behavioral therapy and psychiatric evaluation and management, as needed. *Id.*

On November 13, 2019, chiropractor Wallace Harold Privette, Jr. ("Dr. Privette"), wrote a letter indicating Plaintiff had been under his care for constant back, hip, and neck pain since July 13, 2016. Tr. at 537–39. He stated Plaintiff's pain was relieved by lying down and exacerbated by sitting, standing, driving, and engaging in repetitive hand and leg motions. Tr. at 537. He noted Plaintiff experienced numbness and weakness in her arms and legs; increased pain with walking, standing, stooping, and kneeling; stiffness and soreness in her back and neck; and pain in both hips. *Id.* He indicated Plaintiff had endorsed worsening pain that was affecting her activities of daily living and had not improved over the three years of treatment. *Id.* He wrote: "It is my professional opinion that [Plaintiff] is limited in daily

activities and is unable to work on a sustained basis." *Id.* He stated his opinion was supported by physical exam and standard examinations of strength, spasticity, coordination, and gait. *Id.* He noted his assessments included right-sided sciatica, bilateral hip pain, and segmental and somatic dysfunction of the sacral, lumbar, and pelvic regions. *Id.* He recommended Plaintiff follow up for twice weekly chiropractic care and with her PCP, as needed. Tr. at 538. He further wrote: "In my opinion, [Plaintiff] is unable to resume gainful employment due to physical impairment and while disability can be delayed with treatment, there is no cure. My expectation is that [Plaintiff] will decline in function overtime." *Id.*

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on December 2, 2019, Plaintiff testified she had a driver's license, but only drove when necessary. Tr. at 37. She stated neuropathy caused numbness and tingling in her hands and numbness in her lower extremities that made it difficult for her to drive. Tr. at 38. She indicated she was 5'6" tall and weighed 210 pounds. *Id.* She denied having Medicare, Medicaid, and private health insurance and indicated she last had insurance in 2017. *Id.* She stated she had four adult children who continued to reside in her household. Tr. at 39. She noted three of her children were

working and her fourth child, a 21-year-old son, was disabled. Tr. at 39–40. She stated she had to transport her disabled son to medical visits and make sure he took his medication. Tr. at 40. She said her son had high blood pressure, a learning disability, asthma, bipolar disorder, and schizophrenia. *Id.*

Plaintiff testified she last worked as an assistant manager at Family Dollar in June 2017. Tr. at 41. She denied having scheduled, hired, and fired employees. *Id.* She stated her responsibilities included opening the store, closing the store, maintaining paperwork, ordering inventory, counting and handling money, taking money to the bank, unloading trucks, and ringing up customers' purchases. Tr. at 41–42. She estimated lifting a maximum of 50 pounds in the position. Tr. at 42. She stated she worked at Family Dollar for nearly 15 years. *Id.* She indicated she stopped working because she was no longer able to meet the lifting and standing requirements. *Id.* She stated her employer did not offer a job that she could perform while sitting. *Id.*

In response to her attorney's question, Plaintiff testified she would be unable to perform a job that required she sit throughout the workday because she needed to elevate her legs to reduce her pain. Tr. at 43. She stated she experienced swelling and edema in her lower legs for most of each day. *Id.* She described elevating her legs at chair-level most of the time. Tr. at 44. She indicated she continued to have pain in her legs, with her left leg more

painful than her right. *Id.* She said she also experienced lower back pain most of the time. *Id.* She estimated she could sit for 15 to 20 minutes without elevating her legs or needing to stand. *Id.* She indicated she could also stand for 15 to 20 minutes at a time. Tr. at 45. She said she experienced tingling and numbness in her hands "all the time." *Id.* She stated her hands stayed cold and she had difficulty gripping and wringing out a washcloth. *Id.* She indicated the pain in her hands increased with use. Tr. at 46.

Plaintiff testified she had been using a cane for standing and stability for four to five years. *Id.* She said she used it daily, including in her home. *Id.* She stated she could only walk five to 10 steps prior to needing to rest because of increased pain in her legs. Tr. at 46–47. She estimated she could lift no more than five pounds. Tr. at 47. She stated her medication caused sleepiness. *Id.* She admitted she had recently presented to the mental health clinic, but denied having been referred by a physician. Tr. at 48. She said was experiencing sleepless nights, not eating, crying, secluding herself, not going out, and needed to talk to someone. *Id.* She indicated she slept for six hours, at most, per night. Tr. at 49. She stated pain, anxiety, panic attacks, and depression affected her sleep. *Id.* She said she worried over financial problems. *Id.* She noted she had previously gone out and over to friends' houses, but no longer did. *Id.* She said during a typical day, she walked through her house using her cane, sat with her legs elevated, and would

sometimes lie down. Tr. at 50. She described difficulty with zippers and buttons due to numbness in her hands and stated she had to wear clothing that she could just put on. *Id.* She indicated she had difficulty using a washcloth to bathe and putting her hands all the way up. Tr. at 51. She denied engaging in household chores, yardwork, and meal preparation. *Id.* She said she attended church every Sunday. Tr. at 52. She denied visiting the grocery store. Tr. at 53.

Plaintiff testified that Gabapentin "t[ook] the edge off" her pain, but did not relieve it entirely. Tr. at 52–53. She indicated she took the medication at night, but stated it did not make her feel groggy upon waking. Tr. at 53.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Carey A. Washington, Ph.D., reviewed the record and testified at the hearing. Tr. at 55–60. The VE categorized Plaintiff's PRW as a manager, department (retail store), *Dictionary of Occupational Titles* ("*DOT*") No. 299.137-010, as requiring medium exertion with a specific vocational preparation ("SVP") of 7, per the *DOT*, and 5 as performed. Tr. at 56. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform less than the full range of light work, lifting and/or carrying 20 pounds occasionally and 10 pounds frequently and sitting, standing, and/or walking for six hours each in an eight-hour day; occasionally operate bilateral foot controls; frequently operate

bilateral hand controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally be exposed to unprotected heights and moving mechanical parts. Tr. at 56–57. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 57. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as a folder, *DOT* No. 583.685-042, a ticket taker, *DOT* No. 344.667-010, and an office helper, *DOT* No. 239.567-010, with 150,000, 125,000, and 100,000 positions in the national economy, respectively. Tr. at 57–58.

The ALJ next asked the VE to consider the individual would be off task for 15 percent of the workday, in addition to normal breaks. Tr. at 58. He asked if the individual could perform Plaintiff's PRW or any other work. *Id.* The VE stated the individual would be unable to engage in substantial work on a sustained basis. *Id.*

The ALJ asked the VE if his testimony was consistent with the *DOT*. *Id.* The VE stated it was and was also based on his experience. *Id.*

Plaintiff's attorney asked the VE to consider the individual described in the first question, but to further consider she would require a cane for standing and walking. *Id.* He asked the impact the additional restriction would have on the jobs the VE previously identified. Tr. at 58–59. The VE

stated the same jobs would remain available, but the number of positions would be eroded by 40–45%. Tr. at 59.

Plaintiff's attorney next asked the VE to consider the individual described in the ALJ's first hypothetical question, but to assume she would have to elevate her legs outside of normal break periods. *Id.* He asked the impact the additional restriction would have on the jobs the VE previously identified. *Id.* The VE testified it would not allow performance of the jobs he identified or other work. *Id.*

Plaintiff's attorney asked the VE to consider the individual described in the ALJ's hypothetical question, but to assume the individual would be limited to occasional handling, fingering, and reaching. *Id.* He asked the VE to indicate the impact on the jobs he previously identified and other work. *Id.* The VE stated the additional restrictions would preclude all work. *Id.*

Finally, Plaintiff's attorney asked the VE to consider the individual the ALJ described in the first hypothetical, but to assume she would be limited to standing and walking for less than two hours and sitting for less than six hours. *Id.* He asked if the restriction would preclude competitive employment. *Id.* The VE confirmed that it would. Tr. at 60.

2.    The ALJ's Findings

In his decision dated December 17, 2019, the ALJ made the following

findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.
2.    The claimant has not engaged in substantial gainful activity since June 30, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *se seq.*).
3.    The claimant has the following severe impairments: lumbar degenerative disc disease, obesity, and hereditary and idiopathic neuropathy (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. She can sit, stand and walk for six hours in an eight hour workday. She can occasionally operate foot controls bilaterally. She can frequently operate hand controls with the right and left hands. She can occasionally climb ramps and stairs but can never climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and crawl. She can occasionally work at unprotected heights and around moving mechanical parts.
6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7.    The claimant was born on August 17, 1979 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–24.

## II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ failed to properly evaluate the medical opinions of record; and

2)     the ALJ did not account for Plaintiff's edema in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.     Legal Framework

#### 1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

22

has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of

whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can

the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Medical Opinions

Plaintiff argues the ALJ did not properly evaluate medical opinions from Dr. Byrd and the state agency medical consultants. [ECF No. 25 at 5]. She maintains the ALJ provided insufficient reasons for concluding that Dr. Byrd's opinion was not persuasive, as his opinion was supported by his examination findings and consistent with the other evidence of record. *Id.* at 5–6. She contends the ALJ also failed to provide adequate reasons for finding the state agency consultants' opinions were not particularly persuasive. *Id.* at 6–7.

The Commissioner argues the ALJ appropriately considered the persuasiveness of Dr. Byrd's opinion, finding that it mainly reported

Plaintiff's subjective complaints. [ECF No. 27 at 12]. He maintains the ALJ noted Dr. Byrd was not an orthopedic specialist and that his opinion was contrary to the findings of Dr. Monroe, an orthopedic specialist, who recorded objective findings and reviewed the MRI of Plaintiff's lumbar spine. *Id.* He contends the ALJ also correctly determined that the state agency medical consultants' opinions were based on Plaintiff's subjective reports and Dr. Byrd's opinion. *Id.*

Because Plaintiff's claim for benefits was filed after March 27, 2017, 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2) define what qualifies as a medical opinion. Pursuant to these regulations:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i)    Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)   Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)  Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv)   Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

The applicable regulations require ALJs to consider the persuasiveness of each medical opinion, given the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416.920c(b), (c). The ALJ is not required to defer to or give any specific evidentiary weight to any medical opinion, including one from a claimant's treating medical source. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Supportability and consistency are more important than the other factors, and the ALJ must overtly indicate how he considered these two factors in evaluating each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). Although he may explain how he considered the other factors, he is not so required to do so. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

In evaluating the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion . . . the more persuasive the medical opinion will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion . . . will be." 20

C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Pursuant to 20 C.F.R. § 404.1520b(c)(3)(i) and § 416.920b(c)(3)(i),

"[s]tatements that you are or are not disabled, blind, able to work, or able to

perform regular or continuing work" are "inherently neither valuable nor

persuasive to the issue of whether you are disabled or blind under the Act."

The ALJ is not required to "provide any analysis about how [he] considered

such evidence in [his] . . . decision, even under § 404.1520c [§ 416.920c]." 20

C.F.R. §§ 404.1520b(c), 416.920b(c).

The ALJ addressed the state agency medical consultants' opinions as

follows:

> The state agency physical determinations overstate the
> claimant's condition, particularly her ability to stand/walk in an
> eight hour workday. Both find the claimant can stand/walk for
> only two hours in an eight hour workday. Such finding appears to
> be partly based on the report and opinions of Dr. Byrd. However,
> his opinions are based largely on the claimant's subjective
> complaints. His report does not contain physiological or
> diagnostic findings supporting his opinions. Thus, I find the state
> agency determinations are not particularly persuasive.

Tr. at 22.

The ALJ further discussed Dr. Byrd's opinion, explaining:

> I find the opinions of Dr. Byrd not persuasive. He is not a
> treating physician. He only examined the claimant once, and his
> report mainly consists of the subjective complaints of the
> claimant. Also, he states in the report that he "had no idea of the
> results" of the claimant's lumbar MRI. Further, he is not an
> orthopedic specialist. Dr. Monroe, who is an orthopedic specialist,

examined the March 2018 lumbar MRI and found nothing to support the claimant['s] symptoms. Additionally, his opinions invade the sole province of the Commissioner. Furthermore, his opinions are inconsistent with the record as a whole and are speculative.

Tr. at 23.

The ALJ did not err in considering Dr. Byrd's opinion. Dr. Byrd wrote: "She would be unable to get a job for 8 hours a day 40 hours a week in her current condition." Tr. at 503. The ALJ correctly concluded that Dr. Byrd's opinion "invade[d] the sole province of the Commissioner," as his opinion was that Plaintiff was unable to perform regular and continuing work. Such an opinion does not satisfy the definition of a medical opinion in 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2). Also, pursuant to 20 C.F.R. § 404.1520b(c) and § 416.920b(c), the ALJ was not required to "provide any analysis" as to how he considered Dr. Byrd's statement, even "under § 404.1520c [§ 416.920c]", as it was "inherently neither valuable nor persuasive." Thus, it appears that the ALJ exceeded the regulatory requirements in explaining how he considered Dr. Byrd's statement.

Although the ALJ was not required to provide a detailed explanation as to his consideration of Dr. Byrd's statement, he was required to consider the supportability and consistency of the state agency consultants' opinions in accordance with 20 C.F.R. § 404.1520c and § 416.920c. The ALJ concluded the state agency consultants' opinions were not well-supported because they

were based, in part, on Dr. Byrd's report and opinion. *See* Tr. at 22. A review of the state agency consultant's explanations for their opinions confirms that Dr. Byrd's findings and opinion were among the evidence they considered, but they also considered results of the MRI of Plaintiff's lumbar spine and Dr. Monroe's findings. *See* Tr. at 69–70, 80–81, 96, 107.

After considering the evidence, the state agency consultants reached a different conclusion than Dr. Byrd, finding that Plaintiff could work eight hours a day and 40 hours a week, but would be limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of two hours and sitting for about six hours in an eight-hour workday; occasionally pushing and pulling with the bilateral feet; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently handling with the bilateral upper extremities; and must avoid even moderate exposure to hazards. Tr. at 67–70, 78–81, 94–96, 105–07. Dr. Brown acknowledged the difference between his assessment and Dr. Byrd's, noting: [Per the consultative examiner's medical source statement ("MSS")]: she would be unable to get a job for 8 hours a day/ 40 hours a week in her current condition. This MSS is more restrictive than what the preponderance of the evidence dictates." Tr. at 96, 107.

A comparison between the ALJ's RFC assessment and the state agency consultants' opinions shows similarities as to lifting, operation of foot controls, climbing, and other postural activities. *Compare* Tr. at 20, *with* Tr. at 67–70, 78–81, 94–96, *and* 105–07. The primary difference is as to the length of time that each found Plaintiff could engage in standing and walking. The ALJ found the state agency consultants "overstate[d] the claimant's . . . ability to stand/walk in an eight hour workday," Tr. at 22, but a review of the decision yields no explanation as to why the record did not support such a restriction. *See generally* Tr. at 17–23. In fact, the ALJ cited evidence that arguably would support restrictions as to standing and walking. *See* Tr. at 17–19 (noting complaints of swelling in legs, leg weakness, and ongoing low back pain with radiation to lower extremities; diagnoses of leg edema, cellulitis, peripheral neuropathy, lumbar radiculopathy, and unspecified mononeuropathy of the bilateral lower limbs; observations of use of a cane, difficulty ambulating, and lower extremity edema; findings of reduced ROM in the lumbar spine, increased pain with ROM of the knees and hips, positive SLR, reduced lower extremity strength, and diminished reflexes in the lower extremities; and chiropractor's impression that pain in legs was intensified by standing and walking). Although he further discussed evidence he considered to be inconsistent with Plaintiff's allegations of disabling symptoms, the ALJ did not explain how

such evidence supported a finding that Plaintiff could stand and/or walk for up to six hours in an eight hour workday. *See* Tr. at 21–22 (noting no evidence of significant sensory loss; no evidence of loss of sensation in the lower extremities that could have produced an inability to feel or loss of coordination; absence of a prescription for a cane; and no evidence on MRI to support nerve root compression, herniated disc, or other lumbar condition that could have produced disabling pain or numbness in the lower extremities).

Nowhere in his discussion of the state agency consultants' opinions does the ALJ use the terms "supportability" and "consistency," despite the requirement in 20 C.F.R. § 404.1520c(a), (b)(2) and § 416.920c(a), (b)(2) to articulate how the factors were considered. If it were clear from the decision that the ALJ considered the factors, his failure to explicitly address the terms might be harmless. However, at best, the ALJ vaguely considered the consistency factor in comparing the state agency consultants' opinions to that of Dr. Byrd and erred in finding similarities. He did not discuss whether the state agency consultants' opinions were supported by their reasoning.

Substantial evidence does not support the ALJ's consideration of the medical opinions of record, given his failure to evaluate the state agency consultants' opinions in accordance with 20 C.F.R. § 404.1520c and § 416.920c.

### 2. RFC Assessment

Plaintiff argues the ALJ did not adequately consider her need to elevate her legs to address edema in evaluating her RFC. [ECF No. 25 at 8]. She maintains the record shows she suffers from edema and the ALJ erred in specifically rejecting her claim that she needed to elevate her legs. *Id.* at 9–10.

The Commissioner argues the ALJ appropriately considered Plaintiff's complaints of edema in the decision and cited specific evidence that was contrary to her allegations. [ECF No. 27 at 14–15]. He maintains the ALJ thoroughly explained the RFC assessment. *Id.* at 15–16.

A claimant's RFC represents "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ is required to "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine on a function-by-function basis, how they affect [her] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin* 826 F.3d 176, 188 (4th Cir. 2016)). He should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. §§ 404.1545(a), 416.945(a). He must provide a narrative discussion that includes "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant

evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court provided that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ discussed evidence as to swelling of the lower extremities. He acknowledged Plaintiff presented to the vascular surgeon with swelling in her legs in December 2015 and received diagnoses of bilateral leg edema, cellulitis, and peripheral neuropathy. Tr. at 17. He noted that Plaintiff had no clubbing, cyanosis, or edema during a visit to Healing Springs Health Center in April 2019. Tr. at 18. He indicated March 2019 records from MEDcare Urgent Care showed edema in both legs. Tr. at 19. He recognized Plaintiff's testimony that she had to elevate her legs above her heart upon sitting for an extended period. Tr. at 21.

The ALJ specifically addressed Plaintiff's allegations as to a need to elevate her legs, as follows:

> As for the claimant's contention that she has to elevate her legs above her heart for extended periods of time during the day, while there is some evidence she has experienced some swelling in her lower extremities, there is simply insufficient evidence to

35

establish that such swelling necessitates the need to elevate the claimant's legs as alleged. Also, the evidence within the record does not support finding that the claimant's occurrences of swelling in her legs have been so frequent or severe as to prevent any and all engagement in substantial gainful activity.

Tr. at 22.

The ALJ's rejection of Plaintiff's allegation as to a need to elevate her legs throughout the workday is supported by substantial evidence. He provided an adequate explanation for his conclusion that swelling in Plaintiff's legs had not been as frequent or severe as she alleged, noting the presence of edema during some visits and not others and the overall infrequency of complaints of swelling during treatment visits. *See* Tr. at 17–19, 22. Consistent with the ALJ's finding, most of the records documenting Plaintiff's complaints and her providers' observations of swelling or edema predate her alleged onset of disability. *See* Tr. at 274, 412, 429–36. Also consistent with the ALJ's conclusion, the record appears to only document findings as to swelling or edema during a few visits over the relevant period, with no evidence of swelling or edema during visits with NP Guinn in March 2018 and Dr. Bounds in April 2019 and some evidence of edema during a visit with Dr. Miller in March 2019. *See* Tr. at 496, 505, 536.

Although the ALJ did not address Dr. Miller's December 2015 recommendation that Plaintiff elevate her legs to reduce swelling, he did not err in declining to do so, as the recommendation predated Plaintiff's alleged

onset date and Dr. Miller did not recommend she elevate her legs during a typical workday. *See* Tr. at 435 (reflecting Dr. Miller's recommendation that Plaintiff elevate her bilateral extremities, but failing to specify how often she should do so and authorizing her to return to work at full duty).

Given the foregoing, substantial evidence supports the ALJ's decision not to include a provision in the RFC assessment for elevation of Plaintiff's bilateral lower extremities.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

May 10, 2021                                    Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

37